605 A.2d 649

**Bernard J. DONESKI, et ux.**

v.

**COMPTROLLER OF THE TREASURY.**

**No. 931, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

May 1, 1992.

Bernard J. Doneski, argued (Mary Louise Doneski, on the brief), Bethesda, for appellants.

Gerald Langbaum, Asst. Atty. Gen., Annapolis, argued (J. Joseph Curran, Jr., Atty. Gen., Baltimore and John K. Barry, Asst. Atty. Gen., Annapolis, on the brief), for appellee.

Argued before BISHOP, BLOOM and FISCHER, JJ.

BISHOP, Judge.

The Doneskis, appellants, filed an amended Maryland income tax return with the Comptroller of the Treasury ("Comptroller"), appellee, seeking partial refunds for state taxes they paid in the years 1985, 1986, 1987, and 1988. The Doneskis believed that the gains they recognized from the sale of United States Government obligations and the military retirement pay received by Bernard Doneski, both of which they included in their Maryland taxable income, were not properly taxable by the State of Maryland. The Comptroller disallowed the requested refunds, and the Doneskis appealed the decision to the Maryland Tax Court. On August 15, 1990, the Maryland Tax Court affirmed the

Comptroller's decision to disallow the refund. Again the Doneskis appealed, this time to the Circuit Court for Montgomery County. On May 2, 1991, the Circuit Court affirmed the decision of the Tax Court. Still not satisfied, the Doneskis have appealed to this court.

The Doneskis' various complaints with the Comptroller's determination that they were not entitled to a refund can be broken down into two contentions:

(1) that the State of Maryland cannot tax the gains realized as the result of the sale of United States Government obligations, and

(2) that the State of Maryland discriminates against federal retirees by taxing their pensions differently than state retirees.

## Facts

The Doneskis filed joint resident Maryland income tax returns for all four years in dispute. Each of the four years included as income the pension received by Bernard Doneski from the Department of the Army. Additionally, for the year 1986 their calculation of taxable income included the gain realized from the sale of United States Government obligations. The Doneskis applied to the Comptroller, seeking to amend their returns by using an adjusted calculation of taxable income that did not include these two sources of income. This revised calculation would result in tax refunds of $1,274.60 for 1985, $4,064.70 for 1986, $1,337.02 for 1987, and $1,061.43 for 1988 (a total of $7,737.75). The Comptroller denied the Doneskis' request for a refund.

The Doneskis appealed to the Tax Court which also denied their requested refunds. The Tax Court found that nothing in 31 U.S.C. § 3124(a) prohibited states from taxing the gain on the sale of federal obligations. Additionally, the court found that Maryland's system of taxing pensions did not discriminate in violation of the standard announced in *Davis v. Michigan Department of Treasury*, 489 U.S. 803, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989). In a Memoran-

dum Opinion and Order dated May 2, 1991, the Circuit Court for Montgomery County affirmed the decision of the Tax Court on the same grounds.

*Discussion*

(1)

*Taxation of United States Government Obligations*

The Doneskis argue that 31 U.S.C. § 3124 prohibits the taxation of obligations of the United States. That section reads in pertinent part as follows:

(a) Stocks and obligations of the United States Government are exempt from taxation by a State or political subdivision of a State. The exemption applies to each form of taxation that would require the obligation, the interest on the obligation, or both, to be considered in computing a tax, except—

(1) a nondiscriminatory franchise tax or another nonproperty tax, imposed on a corporation; and

(2) an estate or inheritance tax.

(b) The tax status of interest on obligations and dividends, earnings, or other income from evidences of ownership issued by the Government or an agency and the tax treatment of gain and loss from the disposition of those obligations and evidences of ownership is decided under the Internal Revenue Code of 1986 (26 U.S.C. 1 et seq.).

31 U.S.C. § 3124 (1988). (Section 3124 of the 1988 Code is substantively the same as it was in the tax years in question except the reference to the Internal Revenue Code was updated from "1954" to "1986.") Although section (a) does not expressly exempt the gain or loss recognized from the disposition of United States obligations, the Doneskis contend that it is broad in scope and covers all forms of taxation including those which tax the gain. They find support for their argument in the fact that section (b), which was enacted to terminate the federal tax exemption of United States obligations, does specifically mention gain

which would be necessary only if section (a) prohibits taxing the gain. The Comptroller, however, responds that § 3124 does not preclude taxation of a gain realized on a sale of the obligation but only prohibits taxation on the obligation itself and interest generated by it. He reaches this conclusion based on the fact that "[s]ection 3124(a) does not, within the scope of its prohibition, mention 'profit' or 'gains' " and had Congress intended the gain to be exempt from taxation it would have specifically drafted the statute to so indicate.

 "The cardinal rule of statutory construction is to ascertain and effectuate the actual intent of the Legislature." *Montgomery County v. Lindsay*, 50 Md.App. 675, 678, 440 A.2d 411 (1982) (citations omitted). The intent of the legislature is to be determined through examination of the words of the statute and consideration of the objective of the statute. *Id.* When analyzing the words of a statute, a court should not insert or delete words when the language is plain and free from ambiguity. *Id.* at 679, 440 A.2d 411.

Originally, United States obligations were exempt from both federal and state taxation. In 1917, Congress passed an Act authorizing an additional issue of bonds to help finance the war. Section 11 of the 1917 Act provided "[t]hat any certificates of indebtedness ... issued shall be exempt from all taxes or duties of the United States ... as well as from taxation in any form by or under State, municipal, or local authority...." Act of Sept. 24, 1917, ch. 56, § 11, 40 Stat. 288, (1917).

Then Congress, when enacting the Public Debt Act of 1941, removed the federal tax exempt status of United States obligations but made "no change in the existing law with respect to the taxation of Federal securities by the States and their political subdivisions." H.R. 20, 77th Cong., 1st Sess. at 2–3 (1941); S.R. 41, 77th Cong., 1st Sess. at 3 (1941). As a result of a 1942 amendment, section 4 of the Public Debt Act provided that obligations of the United States should not have any exemption as such "under the Federal tax acts now or hereafter enacted." Corporate Counsel for the District of Columbia construed the words

"Federal tax acts" to include the act of Congress dated July 1, 1902 (32 Stat. 619) that authorized an annual tax upon the gross earnings of national banks in the District of Columbia. Corporate Counsel concluded that the District may tax, as part of a bank's gross earnings, interest on obligations issued by the United States. Congress reacted by once again amending the Act in 1947. These changes were designed to make it clear that no other jurisdiction except the federal government was permitted to tax federal securities. H.R. 423, 80th Cong., 1st Sess. at 1–3 (1947), S.R. 275, 80th Cong., 2nd Sess. at 1–4 (1947).

The 1959 amendment to § 3124, which added the second sentence to § 3124(a), was intended to abolish the formalistic inquiry into whether the tax is on a distinct interest (i.e., a property interest or transaction separate from the ownership of federal obligations), and to replace it with the inquiry into whether computation of the tax requires consideration of federal obligations. *American Bank and Trust Co. v. Dallas County,* 463 U.S. 855, 862, 103 S.Ct. 3369, 3374, 77 L.Ed.2d 1072 (1983), *reh'g denied* 463 U.S. 1250, 104 S.Ct. 39, 77 L.Ed.2d 1457 (1983). Under the 1959 amendment "the tax is barred regardless of its *form* if federal obligations must be considered, either directly or indirectly, in *computing* the tax." *Id.* (emphasis supplied). Federal obligations are "considered" when they are "taken into account or included in the accounting." *Id.; First Nat. Bank of Atlanta v. Bartow County Bd.,* 470 U.S. 583, 588, 105 S.Ct. 1516, 1519, 84 L.Ed.2d 535 (1985). In *American Bank,* the Court found that a tax computed by determining the amount of the bank's capital assets takes into account, at least indirectly, the federal obligations that constitute a part of the bank's assets. 463 U.S. at 863, 103 S.Ct. at 3377.

Further, the 1959 amendment sought to make " 'it clear that both the principal and interest on United States obligations are exempt from *all state taxes* except nondiscriminatory franchise, etc. taxes' (emphasis supplied)." *American Bank,* 463 U.S. at 867, 103 S.Ct. at 3377 (quoting S.Rep.

No. 909, 86th Cong. 1st Sess., 11 (1959) and H.R.Rep. No. 1148, 86th Cong., 1st Sess., 12 (1959)). "Congress intended to sweep away formal distinctions and to invalidate all taxes measured directly or indirectly by the value of federal obligations." *Id.* "The exemption for federal obligations provided by § 3701 (now § 3124), as amended in 1959, is sweeping: with specific exceptions, it 'extends to *every form* of taxation that would require that either the obligations or the interest thereon, or both, *be considered, directly or indirectly, in the computation* of the tax.'" *Id.* at 862, 103 S.Ct. at 3374 (emphasis supplied).

The extent of this exemption was set forth in earlier Supreme Court cases. In *New Jersey Realty Title Ins. Co. v. Division of Tax Appeals,* 338 U.S. 665, 675, 70 S.Ct. 413, 418, 94 L.Ed. 439 (1950), the Supreme Court addressed the issue of "whether in practical operation and effect the tax [on net worth of a corporation, measured by corporate capital and surplus less liabilities] is in part a tax upon federal bonds." *Id.* at 673, 70 S.Ct. at 417. The Court noted that the legislative purpose of § 3701, " 'to prevent taxes which diminish in the slightest degree the market value or the investment attractiveness of obligations issued by the United States in an effort to secure necessary credit[,]' *Smith v. Davis,* 323 US 111, 117, 89 L Ed 107, 111, 65 S Ct 157 [160] (1944)", required the exemption from tax assessment of "interest on federal securities which had accrued but was not yet paid." *Id.* at 675–76, 70 S.Ct. at 418–19. And in *People, ex rel., Leonard v. Commissioners of Taxes, etc., of New York,* 90 N.Y. 63, 65, 55 N.Y.S. 812 (1882), the Supreme Court extended the tax exempt status not only to the par value of United States bonds but also to the premium value of the bonds, namely, the actual market value of the bond in excess of the par value. *Id.* at 65, 55 N.Y.S. 812. The court said:

When therefore a government loan is put upon the market, it is plain to be seen that it may be materially affected if it were known that, whenever the bonds to be issued should, in the market, from any cause, happen to

be at a premium when the assessors came to make their assessment, such premium could be assessed in tax. Such a tax would affect the value of the bonds and embarrass the government in affecting a loan in the same way, if not in the same degree, that a tax upon the bonds, *eo nomine,* would.

*Id.* at 66, 55 N.Y.S. 812. The Court reasoned that a tax upon the premium, which is not distinct and cannot exist apart from the bond, "would affect the value of the bonds and embarrass the government in effecting a loan in the same way, if not in the same degree, that a tax upon" the principal or interest of the bond would and such a tax on principal and interest is clearly exempted. *Id.* at 66–67, 55 N.Y.S. 812. "The premium is part of the entire value of the bond, and when that is taxed the bond is taxed, or what is equally condemned, the value or a part of the value of the bond is taxed." *Id.* at 67, 55 N.Y.S. 812.

▮ With that background, we must now examine the tax scheme as it presently exists in Maryland. The calculation of an individual's Maryland tax liability is based upon that individual's federal adjusted gross income. Md. Tax-General Code Ann. § 10–203 (previously § 10–204) (1991). The federal adjusted gross income includes interest earned from United States obligations issued after March 1, 1941 but excludes interest on state and local bonds. *See* Internal Revenue Code § 103 (1990) and Treas.Reg. § 1.103–4. Whether federal adjusted gross income includes the gain realized upon the sale or transfer of a bond depends on a number of factors, including the type of bond or debt instrument held, when it was issued, and whether the issuer had an intention to call the bond before maturity. *See* Maxwell MacMillian, *Federal Taxes 2nd 1992 Federal Tax Handbook* ¶ 1317 (1991).

In order to calculate the Maryland adjusted gross income, certain adjustments are made to the federal adjusted gross income amount. Various items, which are listed in Md. Tax–General Code Ann. §§ 10–204 and 10–205 (previously §§ 10–205 and 10–206) (Supp.1991), are added to the federal

adjusted gross income. Additionally, under Md. Tax–General Code Ann. §§ 10–207—10–210 (Supp.1991), several classes of income are subtracted. These subtractions include dividend and interest income from United States obligations (§ 10–207(c)) and the profit realized from the sale or exchange of bonds issued by the State (10–207(j)).

The net result is that the interest from United States obligations is always taxed by the federal government and never taxed by Maryland. The gain from sale of United States obligations is sometimes taxed by the federal government and when it is, the amount is included in the federal adjusted gross income and is thereby taxed by the State because there is no provision in Maryland's code which permits its subtraction from federal adjusted gross income. On the other hand, interest on obligations issued by Maryland are not taxed by either the federal government or the State of Maryland. Gains from the sale of Maryland obligations are sometimes taxed by the federal government, but are never taxed by the State of Maryland.

■ We need not address the question as it is posed by the Doneskis, namely, whether the State can tax gains from the sale of federal obligations, because "[a] state tax that imposes a greater burden on holders of federal property than on holders of similar state property impermissibly discriminates against federal obligations." *Memphis Bank & Trust Co. v. Garner*, 459 U.S. 392, 397, 103 S.Ct. 692, 695, 74 L.Ed.2d 562 (1983); *see also New Jersey Realty.*, 338 U.S. at 675, 70 S.Ct. at 418, *Missouri ex rel. Missouri Insurance Co. v. Gehner*, 281 U.S. 313, 321–322, 50 S.Ct. 326, 327–28, 74 L.Ed. 870 (1930). Maryland's taxation scheme, as it is presently constructed, impermissibly discriminates against holders of federal obligations by diminishing the investment attractiveness of the United States obligations in favor of state obligations.

Although § 3124 only expressly prohibits a state from *taxing*, directly or indirectly, a federal obligation or interest thereon, and does not specifically address taxation of capital

gains or state action which discriminates between a federal and state obligation, the purpose of § 3124 as noted in *New Jersey Realty,* is " 'to prevent taxes which diminish in the slightest degree the market value or the investment attractiveness of [federal] obligations ....' " *New Jersey Realty,* 338 U.S. at 675, 70 S.Ct. at 419 (quoting *Smith v. Davis,* 323 U.S. 111, 117, 65 S.Ct. 157, 160, 89 L.Ed. 107 (1944)). The Maryland tax scheme that taxes only gains on federal obligations, but not on state obligations, is impermissibly discriminatory precisely because it makes federal obligations less attractive (i.e., less valuable) than similar state obligations. This in turn violates the purpose of § 3124 expressed in *New Jersey Realty.*

> The state cannot, by any form of taxation, impose any burden upon any part of the national public debt. The Constitution has conferred upon the government power to borrow money on the credit of the United States, and that power cannot be burdened or impeded or in any way affected by the action of any state.

*Home Sav. Bank v. Des Moines,* 205 U.S. 503, 513, 27 S.Ct. 571, 573, 51 L.Ed. 901 (1907); *Weston v. Charleston,* 27 U.S. (2 Pet.) 449, 467, 7 L.Ed. 481 (1829).

This tax clearly discriminates against the federal government and the people with whom it deals in violation of the principle announced in *Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 109 S.Ct. 1500, and reiterated most recently in *Baker v. Kansas,* —— U.S. ——, ——, 112 S.Ct. 1619, ——, 118 L.Ed.2d 243 (1992). Although *Davis* involved a discriminatory state tax on income derived from federal but not state pensions, we find that issue analogous to the one before us concerning a discriminatory state tax on gains from the sale of federal but not state obligations. 489 U.S. at 808–11, 109 S.Ct. at 1504–05. In *Davis* the Court interpreted 4 U.S.C. § 111 (1988), which in relevant part provides:

> The United States consents to the taxation of pay or compensation for personal service as an officer or employee of the United States ... by a duly constituted

taxing authority having jurisdiction, if the taxation does not discriminate against the officer or employee because of the source of the pay or compensation.

After determining that the pension payments to the appellant did amount to "pay or compensation for personal services as an officer or employee" of the federal government the Court concluded

[s]ection 111 did not waive all aspects of intergovernmental tax immunity, however. The final clause of the section contains an exception for state taxes that discriminate against federal employees on the basis of the source of their compensation. This nondiscrimination clause closely parallels the nondiscrimination component of the constitutional immunity doctrine which has, from the time of *McCulloch v. Maryland* [4 Wheat 316, 4 L.Ed. 579 (1819)] barred taxes that "operat[e] so as to discriminate against the Government or those with whom it deals."

*Davis*, 489 U.S. at 812, 109 S.Ct. at 1506 (citations omitted).

The Court concluded "that the Michigan Income Tax Act violates principles of intergovernmental tax immunity by favoring retired state and local government employees over retired federal employees." 489 U.S. at 817, 109 S.Ct. at 1508.

Maryland's present tax scheme discriminates against the holders of United States obligations in relation to holders of Maryland obligations. This discrimination means that United States obligations are less attractive to potential investors if every other factor is held constant.

It is elementary that the bonds or other securities of the United States may not be taxed by state authority. That immunity always has been deemed an attribute of national supremacy and essential to its maintenance. The power of Congress to borrow money on the credit of the United States would be burdened and might be destroyed by state taxation of the means employed for that purpose. *As the tax-exempt feature tends to increase and is reflected in the market price of such securities a state*

*tax burden thereon would adversely effect the terms upon which money may be borrowed to execute the purpose of the general government.* It necessarily follows from the immunity created by Federal authority that a state may not subject one to a greater burden upon his taxable property merely because he owns tax-exempt government securities. Neither ingenuity in calculation nor form of purge in state enactments can deprive the owner of the tax exemption established for the benefit of the United States.

. . . .

. . . [W]here, as in this case, the ownership of United States bonds is made the basis of denying the full exemption which is accorded to those who own no such bonds, this amounts to an infringement of the guaranteed freedom from taxation.

*Missouri Insurance Co.,* 281 U.S. at 320–322, 50 S.Ct. at 327–28 (emphasis added) (citations omitted). All other factors being equal, an investor who is required to pay tax on the gain from the sale of a United States obligation gets a smaller return on every dollar invested than does an investor who pays no tax on the gain from the sale of a state obligation. To attract the same number of investors or the same amount of money from investors under this discriminatory tax scheme, the federal government may be forced to raise the interest rate on its obligations, increasing the cost and decreasing the value of those funds to the federal government. *See id.* Thus, the current tax structure adversely affects the ability of the federal government to raise money and thereby violates the purpose of § 3124.

The Comptroller in its brief does not directly address the issue of discrimination. The Comptroller does cite a passage from *South Carolina v. Baker,* 485 U.S. 505, 523, 108 S.Ct. 1355, 1366, 99 L.Ed.2d 592 (1988), *reh'g denied,* 486 U.S. 1062, 108 S.Ct. 2837, 100 L.Ed.2d 937 (1988), which holds that a state cannot tax the United States directly but can tax private parties with whom the United States does business even though the tax burden falls on the United

States. The Comptroller, however, fails in his argument or response to include the Court's restriction that the tax is constitutional only "so long as the tax does not discriminate against the United States or those with whom it deals." *Id.* 108 S.Ct. at 1366. The Comptroller also cites *Dept of Assess. & Tax. v. Nat. Bank*, 310 Md. 664, 670, 531 A.2d 294 (1987), *appeal dismissed*, 486 U.S. 1048, 108 S.Ct. 2812, 100 L.Ed.2d 913 (1988), for the proposition that the State can tax the gain because it is not "tax[ing] the bonds or the interest on them." That case, however, is inapplicable because not only was the tax in question a franchise tax, but it also did not discriminate against federal obligations. *Id.* at 666, 531 A.2d 294.

It is worth emphasizing specifically that we are not deciding whether a state is prohibited under all circumstances from taxing the gain on a United States obligation, but instead, we are merely holding that the present tax scheme, because it discriminates against holders of United States obligations, violates federal law. Accordingly, the Doneskis are entitled to a refund for the amount of state tax that they paid for the gain they realized on the sale of their United States obligations in 1986.

### (2)

#### *Taxation of Federal Pension*

■ We turn again to *Davis*, to address the appellant's contention that Maryland discriminates against federal retirees by taxing their pension differently than the pension of State retirees. The Supreme Court held in *Davis* that the State of Michigan violated 4 U.S.C. § 111 by taxing the retirement benefits of federal employees but exempting retirement benefits paid by the State. 489 U.S. at 816, 109 S.Ct. at 1508. The relevant part of § 111 is quoted *supra.* As long as a state's tax scheme does not discriminate against those who deal with the federal government, a state can tax federal pensions. *Id.* 109 S.Ct. at 1508.

■ The Doneskis contend that Maryland's tax scheme also violates 4 U.S.C. § 111 because several code provisions discriminate against federal retirees. They point to four different sections of Maryland Tax–General Code Ann. (Supp.1991); § 10–207(h) (fire, rescue, or ambulance personnel length of service award funded by any county or municipal corporation of the state is exempt), § 10–207(d) (income that is attributable to employer-provided vehicles to state, county or local policemen or firemen is exempt), § 10–207(e) (disability pension to policemen and firemen is exempt) and § 10–207(m) (pickup contributions for member of retirement or pension system are exempt), that they claim are discriminatory. Their argument, however, focuses mainly on § 10–207(h). This is probably due to the fact Justice Stevens in his dissenting opinion in *Davis*, in a footnote, listed § 10–207(h) (then § 10–207(*o*)) as one of a number of state code provisions which "grant special tax exemptions for retirement income to state and local government employees that they do not grant to federal employees." *Id.* 109 S.Ct. at 1511 n. 3.

Section 10–207(h) states that "payment received under fire, rescue, or ambulance personnel length of service award program that is funded by any county or municipal corporation of the State" can be subtracted from federal adjusted gross income for purposes of calculating Maryland adjusted gross income. Since this provision was enacted by the legislature in 1988, the length of service programs that have been created have only been for the benefit of *volunteer* firefighters and rescue workers. *See* Md.Ann.Code art. 25, §§ 13A, 13B, 13C, 13D, 32.5, 32.6 (1990 & Supp. 1991); Md.Ann.Code art. 38A, § 43 (1990); *Utica Mut. v. Gaithersburg–Wash. Grove Fire*, 53 Md.App. 589, 598, n. 9, 455 A.2d 987 (1983), *cert. denied*, 296 Md. 224 (1983). Further, the Comptroller has interpreted § 10–207(h) to apply only in cases where the firefighters, rescue workers, or ambulance personnel are volunteers. *See Maryland Income Taxgram*, vol. X, no. 3, at 1–2.

"[Volunteer firemen] are not public officers or public employees." *Macy v. Heverin,* 44 Md.App. 358, 364, 408 A.2d 1067 (1979); *Utica Mut.,* 53 Md.App. at 595, 455 A.2d 987. Moreover, Mr. Doneski, even though he was a federal employee, could have also been a volunteer thereby entitling him to length of service payments. State tax law based on these length of service payments, therefore, does not discriminate against federal retirees because they are not retirement payments for state and local employees. Consequently, § 10–207(h) does not violate 4 U.S.C. § 111 and entitle the Doneskis to a tax refund for taxes paid on his federal pension.

The other code provisions cited by the Doneskis also do not give them the relief they seek, namely, a refund on the taxes they paid for receipt of a federal pension. There is no evidence in the record which indicates that even if §§ 10–207(d), 10–207(e), and 10–207(m) were discriminatory against federal retirees, that the Doneskis would be harmed. The damage which taxpayers suffer as the result of a public wrong is the "prospective pecuniary loss incident to the increase in the amount of taxes he will be constrained to pay by reason of the illegal or *ultra vires* act of the municipality or other political unit." *Ruark v. Engineers' Union,* 157 Md. 576, 589, 146 A. 797 (1929) (emphasis supplied); *Citizens Committee v. Co. Comm.,* 233 Md. 398, 401, 197 A.2d 108 (1964); *see also Citizens Planning and Housing Ass'n v. County Executive,* 273 Md. 333, 339, 329 A.2d 681 (1974); *Carroll Park Manor Community Ass'n v. Board of County Comm'rs of Frederick County,* 50 Md. App. 319, 325, 437 A.2d 689 (1981); *cert. denied* 292 Md. 595 (1982). The Doneskis have provided no evidence that their tax liability would be any less if the tax provisions applied equally to federal and state retirees. In the absence of this type of evidence to show special damages—a pecuniary loss or an increase in taxes—distinct from that of the general public, the Doneskis do not have standing to challenge these provisions of Maryland's tax code. *Citizens Planning,* 273 Md. at 339, 329 A.2d 681. The court is

not permitted to decide a case on the basis of hypothetical facts. *Maryland Pennysaver Group v. Comptroller,* 323 Md. 697, 716–17, 594 A.2d 1142 (1991).

We find that, in Maryland, state government worker's pension payments are taxed exactly the same as federal government worker's pension payments. Thus, there is no discrimination against federal workers in violation of *Davis,* and the Doneskis are not entitled to a refund for any state taxes they paid pursuant to Mr. Doneski's federal pension.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ½ BY APPELLANTS AND ½ BY APPELLEE.